Filed 4/30/14  P. v. Kendricks CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br>v.<br><br>TORRANCE LATRELL KENDRICKS,<br><br>Defendant and Appellant. | F064652<br><br>(Super. Ct. No. BF133816A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Michael G. Bush and Michael E. Dellostritto, Judges.

Susan D. Shors, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Charles A. Martinez and Kevin L. Quade, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

### *INTRODUCTION*

Following a trial in which defendant Torrance Latrell Kendricks represented himself, the jury found him guilty of attempted murder (Pen. Code,[1] §§ 664, 187, subd. (a)), attempted escape (§ 836.6, subd. (b)), reckless driving (Veh. Code, § 23103, subd.

---

[1]     All further statutory references are to the Penal Code unless otherwise indicated.

(a)), trespassing (§ 602, subd. (n)), concealing a weapon in a vehicle (former § 12025, subd. (a)(1)), § 25400, subd. (a)(1), and carrying a loaded firearm (former § 12031, subd. (a)(1), now § 25850, subd. (a)). On the attempted murder count, the jury found true the allegations of premeditation and deliberation and inflicting great bodily injury causing the victim to become comatose. (§ 12022.7, subd. (b).) The trial court sentenced defendant to prison for an aggregate term of 12 years to life as follows: seven years to life on the attempted murder, plus a consecutive five-year term for the great bodily injury enhancement, and concurrent county jail commitments on the remaining counts.

Defendant's sole contention on appeal is that the trial court erred by granting his request to represent himself under *Faretta v. California* (1975) 422 U.S. 806 (*Faretta*) without determining if he was competent to represent himself under *Indiana v. Edwards* (2008) 554 U.S. 164 (*Edwards*) and *People v. Johnson* (2012) 53 Cal.4th 519 (*Johnson*). We disagree with defendant's contention and affirm the judgment.

## *BRIEF FACTUAL SUMMARY*

On September 12, 2010, around 6:00 a.m., defendant sped into a secured parking lot of the Bakersfield Police Department, following an employee who had entered the lot in front of him. In the pouch behind the front passenger seat of his pickup, police found a loaded Glock pistol with one round in its chamber and 10 rounds in its magazine. Three additional magazines, each containing 10 rounds, were located in the pouch of the driver-side door.

In a police interview the same day, defendant admitted the pistol was his personal firearm but claimed he was in the National Guard military police and had authorization to carry a firearm off-duty. He explained he went to the police department that morning for "safe keeping" because he thought his upstairs neighbors had been following him. While it was usually quiet at night, that night he heard voices upstairs saying something like,

2

"He's down there." Defendant "just kind of panicked" and got in his truck and ran to the police department.

On September 14, 2010, around 1:30 p.m., witnesses saw a man, later identified as defendant, kicking, stomping, and choking a woman lying on the sidewalk who was later identified as defendant's mother, Johanne Oliva. Defendant then got inside Oliva's SUV and drove up on the sidewalk and over her body, leaving tire tracks down the middle of her back. Defendant's brother, Glenn Colbert, saw defendant driving Oliva's SUV a few minutes after the attack.

Oliva sustained severe head injuries, a collapsed lung, and was comatose throughout the time she spent at the hospital after the attack. She remained in a semi-comatose state at the time of defendant's trial in February 2012.

Following defendant's arrest, the police interviewed him. In this first interview, he denied any involvement in the attack on Oliva. The police then informed defendant that his mother was not dead, and a witness had identified him and said she saw him on the sidewalk with his mother. Defendant claimed he had not been in that area since early that morning, when he went out jogging.

When defendant was placed in a holding cell after the first interview, he started talking loudly and making incriminating statements. Among other things, he stated: "And, turns out the bitch is still fuckin' alive.… And I did a bad job of that mock fucking-fucking murder too." He continued: "Yes, I murdered Joanne Oliva. Torrance Kendricks murdered Joanne Oliva … on Wenatchee.… [A]nd I was actually driving her vehicle. I hope you find tons of fucking fingerprints." Defendant further stated: "I just wanted to pull her to the side of the road, on Wenatchee, and fucking choke her. And I did a bad—I can't believe I did a bad job. I can, cus I just—that fucking Christian shit."

While in the holding room, defendant also covered the room's peephole with a piece of chewing gum and tried to open his handcuffs with an "unraveled" paperclip.

3

The police removed defendant from the holding room after he made the incriminating statements and interviewed him a second time.  In the second interview, defendant admitted he wanted Oliva dead and tried to kill her.  He described how he tried to choke her but it was "a weak ass" and "improper choke."  He also "bashed her head against the fucking curb … several times and … heard a crack … and it felt good at that point."  Defendant concluded, "I fuckin' murdered her, what else you wanna fucking know."

### The Defense

Defendant testified that he did not trespass on September 12, 2010.  He only entered the secure lot "due to exigency."  Defendant explained it was approximately 6:00 a.m. on a Sunday, and the front of the police department was not yet open or not open to the public.  Defendant went to the police because there was "suspicious activity" and "threatening comments" coming from the upstairs residents.  Defendant was employed by various law enforcement agencies and was authorized under federal and state law to carry a firearm on and off duty.

The last time defendant had contact with his mother was on September 14, 2010, around 12:30 p.m., during her lunch break.  At approximately 2:00 p.m., he received a phone call from someone at his mother's work.  Around 2:30 p.m., he went to the police department and made contact with an officer at the front desk.  At 4:23 p.m., defendant was on a street called Oak when he was taken into police custody.

Defendant claimed his incriminating statements were not true but coerced by the police and based on things they told him to say during the time he was being transported to the holding cell after the first interview and other periods of time not depicted on the video recordings the prosecution showed to the jury.  According to defendant, the police held him for over six hours "without food, water, restroom, and extremely tight cuffs."

4

Defendant complained these deprivations caused him to urinate on himself while he was in the holding room.

### Rebuttal

The police detectives involved in interviewing defendant denied that they made any of the statements defendant claimed they made.

## DISCUSSION

Defendant contends the trial court erred by granting his *Faretta* request to represent himself. Although the court found defendant competent to stand trial and defendant does not dispute that finding, defendant contends that under *Edwards, supra*, 554 U.S. 164 and *Johnson*, *supra*, 53 Cal.4th 519, the court was required to apply a heightened standard in evaluating his request to represent himself. Defendant complains the court here failed to recognize and apply the heightened standard. Defendant further claims his performance at trial demonstrates he was not competent to present his own defense. For reasons discussed below, we reject defendant's claims.

### The Relevant Proceedings in the Trial Court

On November 12, 2010, defense counsel expressed a doubt about defendant's competence to be tried. The trial court suspended the criminal proceedings and appointed Dr. Nick Garcia to evaluate defendant's competency. Dr. Garcia concluded that defendant was competent to stand trial and, on December 10, 2010, the court reinstated criminal proceedings.

On March 11, 2011, defense counsel again expressed a doubt about defendant's competence to stand trial. The trial court suspended proceedings and reappointed Dr. Garcia to evaluate defendant. Dr. Garcia attempted to conduct the evaluation on March 30, 2011, but defendant was belligerent and uncooperative. Consequently, Dr. Garcia was unable to complete an evaluation.

5

On April 11, 2011, the trial court granted defense counsel's motion to appoint a second doctor to evaluate defendant. The second doctor, Dr. Eugene Couture, was unable to complete an evaluation because defendant refused to come out of his cell each time the doctor went to evaluate him.

On May 9, 2011, the trial court relieved Dr. Couture and appointed Dr. Sheila Morris to evaluate defendant. During the hearing, defendant insisted he was "competent to stand trial" and demanded "a speedy trial." Defendant asserted he was "probably just as well-trained" as the judge and had police training. The court responded that it would note defendant's objections to the competency proceedings, but it was still obligated to suspend the proceedings for an evaluation to be conducted.

In a report dated June 9, 2011, Dr. Morris offered the opinion that defendant was incompetent to stand trial. Dr. Morris reported that defendant cooperated in the evaluation but was also condescending, demanding, and argumentative. He exhibited rapid speech, an intense, glaring stare, and appeared grandiose and delusional. Throughout the examination, he talked about religious themes and said people were devils and demons. Although he had above-average intelligence and a good factual understanding, he likely had a poor rational understanding of the proceedings. His delusional and irrational thinking would likely prevent him from forming a "reality-based working relationship" with defense counsel and being able to provide meaningful assistance in his defense. Defendant likely suffered from psychotic disorder, not otherwise specified, and, upon further assessment, might also meet the criteria for schizophrenia, paranoid type. Defendant also likely suffered from posttraumatic stress disorder. Defendant's symptoms were treatable and he would likely have some success reducing his symptoms by taking medication.

On June 23, 2011, the parties submitted on Dr. Morris's report and the court found defendant was not competent to stand trial and referred the matter to Kern County Mental

6

Health for purposes of preparing a section 1370 evaluation. At the hearing, defendant challenged the court's ruling, insisting he was competent to stand trial and demanding they go forward with the trial.

On July 14, 2011, defendant made a *Marsden*[2] motion, requesting the appointment of new counsel. During a confidential hearing on defendant's *Marsden* motion, defendant expressed dissatisfaction with his counsel for questioning his competency. At the conclusion of the hearing, the court denied defendant's *Marsden* motion, vacated its previous finding of incompetency, and reappointed Dr. Garcia to evaluate defendant's competence. The court explained: "[I]n the course of the *Marsden* hearing and looking back at the records and discussing this with [defendant], it is … my belief that there should have been originally two doctors appointed in this particular case as opposed to one doctor [¶] And, apparently, I guess there was just one doctor originally appointed." The court then elicited assurances from defendant that he would cooperate in the evaluation process.

In a report dated August 1, 2011, Dr. Garcia concluded that defendant was competent to stand trial. Dr. Garcia noted that in the past, defendant had been uncooperative during psychological evaluations and meetings with his attorney. However, during the current evaluation, he was cooperative and appeared extremely motivated to present himself in a competent manner. Defendant expressed his ability to cooperate and strategize with his attorney. At one point defendant appeared somewhat grandiose, saying, "I would use my expertise to help my attorney." However, he was able to stay on topic and appeared to have a desire to work with his attorney. Dr. Garcia concluded: "Based on reasonable degree of psychological certainty I believe the Defendant has a reality based appraisal of his circumstances. He is capable of rudimentary decisionmaking and is able to consider different alternatives." Dr. Garcia

---

**2**      *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).

7

offered a diagnosis of bipolar disorder, the most recent episode manic, severe, and with psychotic features. The doctor also offered a diagnosis of paranoid personality disorder.

On August 11, 2011, the trial court received the conflicting reports of Dr. Morris and Dr. Garcia, and appointed a third doctor, Dr. Dean Haddock, to evaluate defendant. In a report dated September 20, 2011, Dr. Haddock concluded that defendant was not competent to stand trial, explaining: "He did not exhibit the ability and capacity to understand the charges against him or to cooperate with his attorney adequately. He is considered a danger to himself and others. He requires Competency Treatment in a secure environment such as a State Hospital." Dr. Haddock offered a diagnosis of schizoaffective disorder, bipolar type, the most recent episode major depressed with mixed manic symptoms, as well as a diagnosis of paranoid personality disorder.

Defendant was admitted to Patton State Hospital on October 21, 2011. On November 16, 2011, the hospital's medical director filed a certification of mental competence (§ 1372). The medical director's report noted that defendant's "behavior as observed since his time of admission has not been suggestive of prominent psychotic symptoms. He has been generally cooperative and directable." Although he "demonstrates some grandiosity … it may be nothing more than an unsophisticated effort to portray himself in what he feels will be a favorable light to the members of his treatment team." While defendant at times appeared suspicious, when questioned, he gave reasonable answers to explain his demeanor. Defendant was not observed to be responding to any internal stimuli and his behavior was organized and his thoughts and speech were linear. The report further noted, "He has maintained this mental status in spite of his consistent refusal to consider medication treatment to help shore up his current level of stability to prevent future decompensations similar to what have been described in the past."

8

The report summarized the earlier, conflicting reports of Drs. Garcia, Morris, and Haddock. The report then described defendant's behavior upon being admitted to the hospital. He was loud and his speech was a bit pressured. However, he "appeared to be driven by an intense desire to have what he was saying be heard and to convey the importance of what he was saying." Defendant accused his defense counsel of working against his interests and stated he wanted to plead not guilty. He understood pleading not guilty would likely lead to a trial unless the charges were somehow dropped and that he faced the risk a jury would believe the evidence indicated his guilt even if he disagreed he was guilty. Defendant also appeared to understand he faced the risk of being sentenced to prison.

When asked what defense counsel would gain by trying to work against his interests, defendant clarified he did not believe she was deliberately trying to harm him. Defendant explained he thought her view of him as incompetent was false and insisted, "I'm not a criminal, I'm not guilty, I'm innocent...she can't make sense of this, and thinks I must be crazy." Defendant described filing a *Marsden* motion in the past and indicated he agreed to withdraw the motion when a new doctor was appointed to evaluate his competency. After being found competent by Dr. Garcia, defendant was surprised when Dr. Haddock subsequently found him to be incompetent, at which point defendant felt betrayed by his attorney. Defendant denied any suicidal or homicidal ideation. He stated that he knew he was placed on suicide watch in the jail but stated, "people are placed on suicide watch all the time without necessarily being suicidal." Defendant concluded by stating, "I don't have any history or any current medical, mental, and/or health issues at all."

While at the hospital, defendant "received treatment consisting of a structured, supportive environment, group therapy, and treatment activities aimed at restoration of competence and reduction of mental health symptoms." Defendant "presented with some

9

relatively mild symptoms that are likely suggestive of a psychotic illness" and "at times reported delusional beliefs." He also occasionally "demonstrated low frustration tolerance, pressured speech, and has at times slipped into some tangential not entirely rational thoughts and speech." The report continued: "Throughout this period of observation however his behavior has been consistently organized and appropriate. The vast majority of the time his thoughts and speech are observed to be linear and on track with the conversation. While he presents with grandiosity he has demonstrated the capability to set it aside sufficiently that he is able to have a reasonable discussion … about his legal case."

The report noted that defendant "does likely have a psychotic disorder but that it is in a low cycle at this time perhaps simply because of the cyclical nature of mental illness but more likely because of the structured, supportive, nonstressful environment of the hospital setting." The medical team also believed defendant would benefit from treatment with antipsychotic medication. However, the fact defendant was not currently exhibiting symptoms prevented "a clear diagnosis." The report concluded that defendant "appears to be in a relatively stable phase of a psychotic illness" and "he is able to meet criteria for competency, though without a consistent medication regimen the treatment team is unable to guarantee that this current ability to meet competency standards will remain stable for any period of time."

At a hearing on November 23, 2011, the trial court indicated it had read and considered the certificate of mental competence and accompanying report. Defense counsel noted she was going to be reassigned and asked the court to put the matter over to December 2011, so the new public defender assigned to the case could meet with defendant before the court made a determination on defendant's competency the report. After defense counsel confirmed she had talked to defendant about it, defendant addressed the court as follows:

10

"THE DEFENDANT: She talked to me briefly but information doesn't appear clear. A miscommunication conflict again. I would like to self-represent myself.

"THE COURT: We're going to put it over and give you a chance to make that record. I'll find good cause. [¶] … [¶]

"At that time, sir, you'll have a chance to make any record as to your desire to represent yourself.

"THE DEFENDANT: I do not want representation by County of Kern or state.

"THE COURT: That's fine. We haven't reinstated criminal proceedings so you'll have an opportunity to make your record and assert your rights. Thank you, sir. Have a seat."

On December 12, 2011, the trial court addressed defendant's *Faretta* request to represent himself as follows:

"THE COURT: Mr. Kendricks, I'm told you wish to represent yourself; is that correct?

"THE DEFENDANT: That's correct.

"THE COURT: I want to ask you some questions.

"Have you ever represented yourself before, Mr. Kendricks?

"THE DEFENDANT: First time in Superior Court. No, sir.

"THE COURT: Have you represented yourself someplace else?

"THE DEFENDANT: I did in isolated private hearings, different type of hearings, outside of this type of court proceeding. So I have self-representation experience, but reference Kern County Superior Court or any other type of criminal complaint, no. I have no prior record of any arrest or criminal complaint.

"THE COURT: What's your educational level?

"THE DEFENDANT: I am a criminal justice major.

"THE COURT: You are able to read and write, then?

11

"THE DEFENDANT: I can read and write.

"THE COURT: You understand that if you are allowed to represent yourself, that you will be required to know the law, the evidence law, the Penal Code, whatever law might apply?

"THE DEFENDANT: That will—POST training, I understand the elements of crime and the chain of evidence and everything else that's stipulated.

"THE COURT: But even a police officer hasn't gone to law school. Whoever represents the People on this case, if it's Ms. Danville or somebody else, they will have gone to law school and been specifically trained as a prosecutor. Do you understand that?

"THE DEFENDANT: I understand.

"THE COURT: You don't have that type of training, though?

"THE DEFENDANT: I have some limited training. However, I have not been to law school so no, sir.

"THE COURT: If you are allowed to represent yourself, though, you are going to be required to act as if you had been to law school, and you get no special breaks from the judge hearing your case. The judge isn't going to help you out. You have to know the law just as you would if you were an attorney. You understand that?

"THE DEFENDANT: Yes, sir. [¶] … [¶]

"THE COURT: Have you read either the crime reports or the information in this case?

"THE DEFENDANT: I read all the information in the complaint. I read all the information, criminal complaint, witness information, anything pertaining to this case.

"THE COURT: You think you understand it okay?

"THE DEFENDANT: I completely understand the case.

"THE COURT: You are not going to get any special—you will get to use the law library in the jail, of course. You are in custody. As long as you remain in custody, you will get to use the law library just like anybody

12

else.  You are not going to get any special breaks from the Sheriff's Department.  You understand that?

"THE DEFENDANT:  Yes, sir.

"THE COURT:  I don't appoint co-counsel or advisory counsel.  I don't appoint a paralegal to do your work for you.  Do you understand that?

"THE DEFENDANT:  Yes, sir.

"THE COURT:  Do you understand that if you chose to, we would have the public defender represent you.  And Mr. Nkwonta, he has been to law school, this is what he does.  It doesn't cost you anything, generally speaking, in order to have the public defender appointed free of charge.  Do you understand that?

"THE DEFENDANT:  I understand that, sir.

"THE COURT:  Knowing that, you wish to give up that right and still represent yourself?

"THE DEFENDANT:  I would like to represent myself.

"THE COURT:  If you represent yourself and you are convicted, on appeal you cannot claim that you did not do a good job or an inadequate job.  You can't claim incompetence of counsel if you are representing yourself.  You understand that?

"THE DEFENDANT:  I completely understand that.  [¶] … [¶]

"THE COURT:  …You understand that it's really unwise to represent yourself?  Even a lawyer or a judge who gets arrested and prosecuted oftentimes almost always will hire their attorney.  It's almost always a bad idea.

"THE DEFENDANT:  I understand that there is a self risk or some type of risk.  I do completely understand that.

"THE COURT:  If you do—if you are allowed to represent yourself, I'm not going to allow you to change your mind to postpone the trial.  So if you leave the trial dates as they are set, you are not going to be able to come in on the day of trial and say, well, I'm representing myself, now I want my attorney back.  Once you represent yourself, that could be it.  Do you understand that?

"THE DEFENDANT: I do, sir. Yes, sir.

"THE COURT: But if you are in any way disruptive or trying to misbehave during the case, I can revoke it and then reappoint the public defender. Do you understand that?

"THE DEFENDANT: That's understandable.

"THE COURT: Do you understand the charges against you?

"THE DEFENDANT: Yes, I do, sir.

"THE COURT: What are they?

"THE DEFENDANT: There is two felony charges, there is five misdemeanors. The two felonies are 664/187. The second felony would be 245. And the misdemeanors would be 23103 and then the 602 (n) and then the 12025 and 12031 and 836.6.

"THE COURT: That's fine. Do you understand how much time you are looking at in prison if you get convicted?

"THE DEFENDANT: Due to the nature of the felonies, there is definitely prison time, any range from—I looked my method and knowledge, which is accurate, anywhere from two years, three years up to 10 to 15 plus years. Depends on the nature—it depends on sentencing.

"THE COURT: So it could range—

"THE DEFENDANT: It's definitely prison time due to those felonies.

"THE COURT: Knowing all—knowing we would give you a free attorney, you still want to represent yourself?

"THE DEFENDANT: I definitely want to represent myself.

"THE COURT: When could you be ready for trial?

"THE DEFENDANT: I'm—I request a speedy trial.

"THE COURT: You are not going to waive time?

"THE DEFENDANT: I'm not going to waive time."

14

The trial court continued the motion to do more research on whether defendant could represent himself when the proceedings were still suspended.

On December 14, 2011, the trial court continued to discuss defendant's *Faretta* motion as follows:

> "THE COURT:  We're in the middle of motions and discussion as to whether or not the defendant can represent himself.
>
> "Mr. Kendricks, is that still your request?
>
> "THE DEFENDANT:  I still pursue self-representation and speedy trial and pursue it immediately.
>
> "THE COURT:  I have considered your motion and the citations [the prosecutor] Miss Danville sent us .…
>
> "I did not get anything from you, [defense counsel] Mr. Nkwonta.
>
> "MR. NKWONTA:  Judge, I do—actually I do have a couple of cases.  I'm not sure these cases are really germane to the issue, but I was intending to advance the competency trial to today's date, and I'm inclined to submit on the report from the hospital.
>
> "THE COURT:  Let me ask this, okay, I also— just so the record— coincidentally, in the Daily Journal there was a article, issue somewhat in front of the California Supreme Court right now, and the case was *Johnson*. It was unpublished First Appellate District, apparently just argued couple days ago in the Supreme Court.  And then there's United States Supreme Court indicated *Edward versus Indiana* 554 U.S.164.
>
> "But I just throw that out at you.
>
> "Mr. Kendricks let me ask you this:  If Mr. Nkwonta submits on the report, I did review the report because you said I could, are you going to submit on the report, too?
>
> "THE DEFENDANT:  Yes, sir.
>
> "THE COURT:  I'll tell you tentatively I'm going to make a finding you're competent to stand trial.  That's my tentative.

15

"If I make that finding, you're still going to want to represent yourself at trial or then do you want Mr. Nkwonta to represent you at trial?

"THE DEFENDANT: I want to represent myself from now until trial proceeding with self-representation. No need for anything else other than what I have—provide myself as counsel. [¶] … [¶]

"THE COURT: Based on the report of Patton, I will find the defendant is restored to competency. I will reinstate criminal proceedings, reset the trial dates.

"But I want to do the *Faretta* motion first.

"Mr. Kendricks, you still want to represent yourself?

"THE DEFENDANT: I do.

"THE COURT: Do you remember all my discussions from the other day?

"THE DEFENDANT: I do."

After the parties submitted the matter, the trial court stated, "I think he's competent to represent himself." The prosecutor agreed, "I do, too." The court then relieved the public defender's office and ordered it be shown defendant would be representing himself.

Prior to jury selection on February 9, 2012, the trial court again addressed defendant's decision to represent himself:

"THE COURT: We're going to go back on the record and I talked to you about this off the record and I want to talk to you about it now on the record.

"You've been your own lawyer for about two months so far; is that correct?

"THE DEFENDANT: Currently in this particular case, yes.

"MS. DANVILLE: I believe it was the 14th of December to be exact.

"THE DEFENDANT: It was the 14th of December.

16

"THE COURT:  We're almost at two months.  We're going into two months.  And I appreciate you've been your lawyer in other matters, Mr. Kendricks, but I want to give you this opportunity—based with what's in front of you, that is, actually trying your case where you're looking at a charge which essentially could potentially put you in prison for life.

"Is it still your decision that you wish to represent yourself at this time?

"THE DEFENDANT:  Yeah, definitely.

"THE COURT:  Do you have any questions?

"THE DEFENDANT:  I'm totally aware of the statute of limitations and a speedy trial.  And I have made a note of everything that is going on.  This is what I want.  I will say it—this will be the first and last time to reference the issue of the jury and I will stop, so I won't get into this ramble.

"THE COURT:  Here's what I want to ask you, Mr. Kendricks.

"THE DEFEDNANT:  I want the jury selection to go smoothly and quick as possible and without prejudice.

"THE COURT:  That's what everybody—

"THE DEFENDANT:  And then I can get on and be released from custody and go back to work as a police officer.  It's just as simple as that."

On February 10, 2012, defendant's former defense counsel, Stephanie Gunther, appeared as defendant's "next friend" to raise concerns regarding his competency to represent himself.  After Ms. Gunther acknowledged the last time she actually conferred with defendant about the case in a confidential setting was in September 2011, both defendant and the prosecutor objected to Ms. Gunther being permitted to address the court.  Among other things, the prosecutor argued there was no evidence of any change of circumstance since the court found him competent to stand trial on December 14, 2011, and complained it was presumptuous for defense counsel to think she knew better than the medical director of the state hospital who authored the report the court relied on in making its competency determination.

17

Despite the parties' objections, the trial court permitted Ms. Gunther to explain her concerns about defendant's competency. She explained:

> "Your Honor, just very briefly, when I spoke with him yesterday in court, I told him that his father was present and if I could just please give a little history. Before Your Honor was hearing Mr. Kendricks 1368, his many, many 1368 hearings.…
>
> "Mr. Kendricks' father was sitting in the courtroom and it was my understanding that Mr. Kendricks blurted out that he did not want that black man, meaning his father, to be allowed in his courtroom. Mr. Kendricks' father was very injured by that because he and his son had a incredibly good relationship. Mr. Kendricks' father was in court yesterday and when I told Torrance, Torrance, your father is here. Torrance said to me, I have no father.
>
> "Your Honor, I believe, based upon the fact that he disavowed even having a father, I believe he's still operating under a delusional system. I believe Mr. Kendricks is very intelligent, and I believe he is a very capable young man, but I believe that right now his mental state is interfering with his ability to rationally appreciate—"

The trial court expressed appreciation to Ms. Gunther for sharing her concerns but concluded, "I think under the circumstances, I don't feel that your particular opinion at this time would really be of any benefit to the Court." The court explained, "you really haven't had sufficient contact with him for many, many months to where I would be able to give or find it even appropriate to give your request — the weight such that I would consider suspending the criminal proceedings." The court noted that it had been involved in some of the prior section 1368 proceedings, had reread all the reports, and was "fully apprised of [defendant's] mental history." The court assured Ms. Gunther that the court and the prosecutor were both aware of defendant's history, and if either had concerns about defendant's competency based on his performance or actions during the proceedings, then they would address those issues when they occurred to ensure defendant received a fair trial.

18

After responding to Ms. Gunther's concerns, the court went on to make these additional comments:

> "And I appreciate—and this is the type of case where we have to be particularly alert to the record, but I am alert to his situation, and I understand his situation and the history, but I don't find anything that leads me to believe that he's not competent to stand trial, so we're going to proceed with the trial based on anything that I have seen during the time that he's been in front of this court since it was sent here for trial proceedings yesterday, but we will proceed today on the basis that this court does not find any reason to believe that he's not competent to stand trial at this time.

> "There is an underlying issue which he does have a mental illness that's intermittent. And I did reread the reports and he does have a mental illness and he's been diagnosed with brief psychotic episodes. I don't find at this time because of that mental illness that he's incapable of representing himself. I'm going to be dealing with—I'm going to be asking him some more questions. The problem we have obviously at this time is even if I were to so find and overruling his right to represent himself, finding that he would not be competent to conduct the trial, even though he's competent to stand trial.

> "We would have a double jeopardy issue. We have sworn in the jurors, and there's a lot of issues that we have to deal with, so I'm alert to all those issues.…"

After these remarks, the trial court engaged in a lengthy discussion with defendant "to reaffirm" defendant's understanding of what it meant to represent himself. Among other things the court addressed defendant's limited ability to conduct an investigation without counsel, defendant's decision to dress in jail clothes instead of civilian clothes, and the court's recommendation that defendant not proceed without counsel:

> "THE COURT: Now, the trial has commenced and we are going to be doing motions this morning and ultimately selecting the jury this afternoon, so at some point if you need to continue the trial, you will have to make a motion, but based on this state of the case; that is, where we are in trial, it's unlikely I will grant any motion to continue the trial, because you're not able to accomplish things that an attorney can accomplish with an investigator in the course of the trial, do you understand that?

19

"THE DEFENDANT: I understand your perception of that, but I stipulate to what you're saying as in that's not true. I say that's not true, but this is for the record if I could speak?

"THE COURT: I just want to make sure you understand. I'm going to let you speak when we're done.

"THE DEFENDANT: Roger that.

"THE COURT: You may have difficulty preparing because you don't have access to—

"THE DEFENDANT: For the record, I do not. This case I have prepared and I've investigated and I have everything I need. I've already looked through all the files. I looked through everything I need. I just need you to go through that motion request information from you—from the Court that I can utilize to prepare during this case as it were to proceed to trial; however, I've done the investigations and I've done the foot work. I'm trained to do that and I have everything I need, so I'm qualified, so there's no question in that at all. [¶] … [¶]

"THE COURT: And do you understand it is the recommendation of this court and I'm assuming of the—the Court that allowed you to represent—that you not represent yourself and that's this court recommendation, do you understand that?

"THE DEFENDANT: I understand that. I understand that very well. Just for your information, just to let you know, sir, that way I won't interrupt your statements. This isn't a matter or issue that I cannot hire an attorney. I can hire an attorney. I can hire Johnny Cochran to represent me. I have plenty of sufficient funds to hire an attorney.

"As a matter of fact, I have sufficient funds. In fact, I could be sitting here in a tuxedo and have anything else I want. I have sufficient funds. I have plenty of funds, so it's not a matter of me not being able to hire an attorney, it's a matter of me wanting to exercise my constitutional rights and them not being violated and me having training and experience looking through this case and proceeding with this case knowing the projected outcome. It's simple. It's a simple process.

"THE COURT: Well, the case isn't simple. I hope you don't think it's simple. I appreciate in your mind it may be simple, but trust me, it's not going to be a simple case. Number two, obviously, I'm not challenging or suggesting that you could not hire an attorney. I'm simply telling you,

20

number one, if you could not hire an attorney, you would be given a free attorney. I want to make sure you understand that. You will be given a free investigator, experts. You're entitled to have free experts, and you have to be able to request those things if you are representing yourself.

"And, I assume, you're choosing not to based on your knowledge of the case, but if you had an investigator or you had an attorney, certainly, they would know about doing those types of things, so I'm not—I'm telling you it's my suggestion—my recommendation that you not represent yourself. I'm not going to deny your right to represent yourself. I'm telling I'm recommending that you don't represent yourself. I don't recall a case for someone representing themselves and has actually won the case in my experience, and that's why I'm making that recommendation along with other reasons that I have given you, so I want you to understand that.

"Now, with all that in mind, number one, you're still obviously dressed in jail clothes and we discussed this yesterday, and it's still your desire to remain in jail clothes even though I'm telling you I would provide you free of charge civilian clothing?

"Is it still your desire to remain in jail clothing?

"THE DEFENDANT: Yes, sir.

"THE COURT: All right. And it's still—and this is obviously the most important part. It is still your desire to waive your right to counsel? Do you, in fact—do you waive your right to counsel and wish to continue to represent yourself at this time?

"THE DEFENDANT: I'm not going to stipulate on your terminology. I'm waiving my right to counsel. I have a right to counsel and I have a right to self-representation and I will stipulate to my self-representation and be found as one to represent himself. I'm already in beyond that stage and I'm going through the process in your courtroom to clarify as to where I stipulate today as me continuing self-representation and I want to and I will continue to represent myself and be my co-counsel.

"THE COURT: I think you've made your intentions clear. I just want to make sure you understand and perhaps you made a good point, Mr. Kendricks. You do have a right—you're giving up your right to have an attorney who is—

"THE DEFENDANT: Appointed.

21

"THE COURT: —an attorney who is appointed, but also an attorney who has to have gone to law school, passed the bar, who is a member of the California Bar that represent you, do you understand that and you're willing to give that up; is that correct?

"THE DEFENDANT: I understand that.

"THE COURT: And you're waiving that right?

"THE DEFENDANT: I will waive that particular right and that me not being appointed an attorney from the State or the County of Kern.

"THE COURT: All right. Any other—do you have any questions then Mr.—

"THE DEFENDANT: I do not.

"THE COURT: —Kendricks with regard to representing yourself or being dressed or anything of that sort?

"THE DEFENDANT: I do not. I have just as much training as the one in the Bar and I'm fine.

"THE COURT: All right.

"THE DEFENDANT: Do you want me to bring out my transcripts and bring them up to you and my background and training?

"THE COURT: Mr. Kendricks, you're never going to convince me that you got the training that a lawyer has no matter how much you tell me that so you might save yourself some time in attempting to convince me that you have that type of training. I'm never going to believe—unless you have a license, unless you have graduated from law school.

"THE DEFENDANDT: Paralegal.

"THE COURT: But it's important that you understand you don't have that training. What's important is that you do understand that you don't have the training. What's important is that you understand you're going to have to handle your own case and you do understand that and you wish to represent yourself; is that correct or not?

"THE DEFENDANT: Yes, I'm representing myself.

"THE COURT: All right."

22

***The Law at the Time of Defendant's Request for Self-representation***

In *Faretta*, *supra*, 422 U.S. 806, the United States Supreme Court held the Sixth Amendment to the United States Constitution gives criminal defendants the right to represent themselves. Before *Faretta* was decided, the law in California had been that a criminal defendant had no constitutional or statutory right to self-representation, except, in noncapital cases, the trial court had discretion to grant a defendant's request for self-representation. (*People v. Sharp* (1972) 7 Cal.3d 448, 459, 461, 463-464.)

"In the wake of *Faretta*'s strong constitutional statement, California courts tended to view the federal self-representation right as absolute, assuming a valid waiver of counsel." (*People v. Taylor* (2009) 47 Cal.4th 850, 872 (*Taylor*).) In other words, a trial court had to grant a defendant's request for self-representation if the defendant voluntarily and intelligently elected to do so, even if the defendant, though competent to stand trial, was not competent to serve as his or her own attorney. (*Id.* at pp. 872-873.)

In *Godinez v. Moran* (1993) 509 U.S. 389 (*Godinez*), the United States Supreme Court appeared to confirm that a separate competence requirement for self-representation did not exist under federal law. In *Godinez*, the defendant sought and was allowed to waive counsel and plead guilty to murder charges in state court. (*Id.* at pp. 391-393.) On petition for a writ of habeas corpus, the federal appeals court held that even though the defendant was competent to stand trial, he was not competent to waive counsel and plead guilty. (*Id.* at pp. 393-394.) The Supreme Court reversed, rejecting the argument that federal law required a higher standard of competence for waiving counsel or pleading guilty than is required to stand trial. (*Id.* at p. 402.) California courts, including the California Supreme Court, generally interpreted *Faretta* and *Godinez* as holding the required degree of competency to stand trial and the required degree of competency to waive counsel were the same. (*Taylor*, *supra*, 47 Cal.4th at pp. 874-876.)

23

In 2008, the United States Supreme Court decided *Edwards*, *supra*, 554 U.S. 164. In that case, the Indiana state trial court denied the defendant's request for self-representation and found that, while the defendant was competent to stand trial, he was not competent to represent himself at trial. (*Id.* at p. 169.) An Indiana appellate court ordered a new trial, and the Indiana Supreme Court affirmed the appellate court on the ground *Faretta* and *Godinez* required the trial court to permit the defendant to represent himself. (*Edwards*, *supra*, at p. 169.) The United States Supreme Court reversed, holding:

> "[T]he Constitution permits judges to take realistic account of the particular defendant's mental capacities by asking whether a defendant who seeks to conduct his own defense at trial is mentally competent to do so. That is to say, the Constitution permits States to insist upon representation by counsel for those competent enough to stand trial under *Dusky* [*v. United States* (1960) 362 U.S. 402] but who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves." (*Edwards*, *supra*, 554 U.S. at pp. 177-178.)

The court called those defendants who are competent to stand trial but not to represent themselves "gray-area defendants." (*Id.* at p. 174.)

*Edwards* did not hold that due process requires a higher standard of mental competence for self-representation than is required to stand trial with counsel. Rather, "[t]he *Edwards* court held only that states *may*, without running afoul of *Faretta*, impose a higher standard ...." (*Taylor*, *supra*, 47 Cal.4th at pp. 877-878.) In *Taylor*, the California Supreme Court upheld the trial court's decision to grant the defendant's request for self-representation. (*Id.* at pp. 856, 868, 878-879.) Because *Edwards* did not mandate the application of "'a dual standard of competency for mentally ill defendants,'" that case "does not support a claim of federal constitutional error in a case like the present one, in which defendant's request to represent himself was granted." (*Taylor*, *supra*, p. 878; see also *Johnson*, *supra*, 53 Cal.4th at p. 527.)

24

The *Taylor* court also rejected the defendant's argument the trial court should have exercised its discretion, recognized in *Edwards*, to apply a higher standard than competence to stand trial. (*Taylor*, *supra*, 47 Cal.4th at p. 879.) "We reject the claim of error because, at the time of defendant's trial, state law provided the trial court with no test of mental competence to apply other than the *Dusky* standard of competence to stand trial [citation], under which defendant had already been found competent." (*Ibid.*)

### *The Law at the Time of Trial*

On January 30, 2012, less than two weeks before defendant's trial commenced, the California Supreme Court decided *Johnson*, *supra*, 53 Cal.4th 519. In that case, the trial court revoked the defendant's self-representation. (*Id.* at p. 525.) The California Supreme Court had to decide "whether California courts may accept *Edwards*'s invitation and deny self-representation to gray-area defendants." (*Id.* at p. 527.) The Supreme Court concluded that California trial courts have discretion to deny self-representation to gray-area defendants. The court reasoned:

> "Indeed, to refuse to recognize such discretion would be inconsistent with California's own law. In *People v. Floyd* [(1970)] 1 Cal.3d 694, we upheld the denial of a capital defendant's request for self-representation citing, among other factors, his youth, his low level of education, and his ignorance of the law. [Citation.] Certainly, a defendant who could be denied self-representation under *Edwards*, *supra*, 554 U.S. 164, could also have been denied self-representation under *People v. Sharp*, *supra*, 7 Cal.3d 448, and *People v. Floyd*. Denying self-representation when *Edwards* permits such denial does not violate the Sixth Amendment right of self-representation. Because California law provides *no* statutory or constitutional right of self-representation, such denial also does not violate a state right. Consistent with long-established California law, we hold that trial courts may deny self-representation in those cases where *Edwards* permits such denial." (*Johnson, supra,* at p. 528.)

The *Johnson* court considered several different standards by which to measure competence, and concluded: "[P]ending further guidance from the high court, we believe the standard that trial courts considering exercising their discretion to deny self-

25

representation should apply is simply whether the defendant suffers from a severe mental illness to the point where he or she cannot carry out the basic tasks needed to present the defense without the help of counsel." (*Johnson*, *supra*, 53 Cal.4th at p. 530.)

*Analysis*

Contrary to defendant's assertion, *Johnson* does not appear to *require* trial courts to apply a heightened standard of competence when evaluating a defendant's request for self-representation. *Johnson*, applying *Edwards*, does not address whether a trial court must, as opposed to may, apply a heightened test of competence to a defendant's request for self-representation. Rather, *Johnson* and *Edwards* simply "'permit[] judges to take realistic account of the particular defendant's mental capacities by asking whether a defendant who seeks to conduct his own defense at trial is mentally competent to do so.'" (*Johnson*, *supra*, 53 Cal.4th at p. 527, quoting *Edwards*, *supra*, 554 U.S. at p. 177.) In fact, under *Johnson*, "[a] trial court need not routinely inquire into the mental competence of a defendant seeking self-representation. It needs to do so *only if it is considering denying self-representation* due to doubts about the defendant's mental competence." (*Johnson*, at p. 530, italics added.) If that is the case, "it *may* order a psychological or psychiatric examination to inquire into *that* question." (*Ibid.*, first italics added.) "To minimize the risk of improperly denying self-representation to a competent defendant, 'trial courts should be cautious about making an incompetence finding without benefit of an expert evaluation, though the judge's own observations of the defendant's in-court behavior will also provide key support for an incompetence finding and should be expressly placed on the record.' [Citation.]" (*Id.* at pp. 530-531.)

We also disagree with defendant's assertions that the individual judges who considered his request for self-representation committed error in this case under the applicable legal authorities. After finding defendant competent to stand trial and reinstating criminal proceedings in December 2011, Judge Michael G. Bush granted

26

defendant's *Faretta* motion for self-representation. Here, as in *Taylor*, *supra*, 47 Cal.App.3d at p. 878, Judge Bush's decision to grant self-representation did not support a claim of federal constitutional error. At the time of Judge Bush's ruling, California state law did not provide a standard of competence for self-representation different from the standard required to stand trial. (*Taylor*, *supra*, 47 Cal.4th at p. 879.) As defendant does not deny he was competent to stand trial, he likewise met the competency standard to represent himself at trial.

Judge Michael E. Dellostritto, who presided over defendant's jury trial, revisited the issue in February 2012. Like Judge Bush, Judge Dellostritto advised defendant at great length on his right to counsel and the perils of self-representation. Notwithstanding defendant's assertions to the contrary, the record here indicates Judge Dellostritto was aware of his discretion to deny self-representation to defendant, even if defendant was competent to stand trial. Although Judge Dellostritto did not explicitly refer to *Johnson* or *Edwards*, he addressed a number of comments to defendant during the proceedings using language suggesting familiarity with the holdings of those decisions. For example, during pretrial motions on February 15, 2012, Judge Dellostritto warned defendant: "If I determine … that you have a mental illness that prevents you from effectively or in some fashion handling the duties of the task of representing yourself, I can terminate [self-representation] as well, even though you are found competent to stand trial." And a few days later, Judge Dellostritto observed:

> "I haven't seen anything in this trial that leads me to believe you are suffering from any sort of psychosis at this time. And *I don't see anything that leads me to believe if, in fact, you do have some sort of mental illness that it is in some fashion preventing you from carrying out the basic task that you would need to do to represent yourself in this case.* Your questioning has been appropriate to the witnesses so far, so I don't see any evidence as that would support the idea that you're not capable at this point of carrying out the task of representing yourself—which is in accordance of what you keep telling the Court that you're capable of doing this, so we

27

will see what happens. You're asking appropriate questions and so forth." (Italics added.)

Judge Dellostritto's positive comments regarding defendant's self-representation contradict defendant's suggestion on appeal that the judge permitted defendant to represent himself based on an erroneous belief that withdrawing permission for self-representation would raise a problem with double jeopardy issues. Although the Judge Dellostritto did express some concerns in this regard, they do not appear to have been the basis of his decision to allow defendant to continue representing himself at trial. There is no indication the Judge Dellostritto viewed defendant as a gray-area defendant or was actually "considering denying self-representation due to doubts about the defendant's mental competence" such that this consideration would have triggered a need to inquire further into the issue. (*Johnson*, *supra*, 53 Cal.4th at p. 530.) Rather, the judge seemed primarily concerned with impressing on defendant the risks of self-representation and ensuring that defendant's waiver of counsel was made with full knowledge of the potential consequences.

In any event, substantial evidence supports the conclusion that defendant was competent to represent himself under the *Johnson* test. "As with other determinations regarding self-representation, we must defer largely to the trial court's discretion." (*Johnson*, *supra*, 53 Cal.4th at p. 531.) "The trial court's determination regarding a defendant's competence must be upheld if supported by substantial evidence." (*Ibid.*)

Here, there was no indication that defendant's mental illness was so severe it was interfering with his ability to carry out the basic tasks needed to present his defense without the help of counsel. Defendant made coherent opening and closing statements. He made objections which were sustained and elicited favorable testimony in his cross-examination of prosecution witnesses. For example, the single eyewitness who positively identified defendant as Oliva's attacker acknowledged she was initially uncertain about his identity when she viewed his photo in a photo lineup. Defendant also offered jury

28

instructions, including one which the court gave to the jury instructing that defendant did not unlawfully carry a concealed firearm in any vehicle if he was an on-duty member of the National Guard at the time of the alleged offense.

It is true defendant exhibited symptoms of his mental illness, such as grandiosity and hostility, during the trial. However, his behavior was very similar to that described in the November 2011 report certifying his competency. Although the report specifically addressed his competency to stand trial, not his competency for self-representation, it is nonetheless informative because it reflects that defendant's mental state did not undergo any noticeable or significant changes from the time he was found competent to stand trial and the time trial commenced. And while it is true all the doctors who evaluated defendant believed him to have a mental illness, they disagreed as to the degree of its severity. After defendant was found incompetent and admitted to the state hospital, he was found competent within just a few weeks after the medical staff observed that, from the time he was admitted to the hospital, his symptoms were relatively mild and remained stable throughout his stay despite his refusal to take medication. Although the report did not say so explicitly, it appeared to suggest that defendant arrived at the hospital already competent and the medical staff essentially agreed with Dr. Garcia's previous findings of competency.

The medical staff noted defendant displayed grandiosity but opined it was possible it was driven by a desire to impress. Therefore, we cannot agree with defendant that his displays of grandiosity at trial—such as his statements to the court that he could afford to hire Johnny Cochran or wear a tuxedo instead of jail attire if he chose to—constituted evidence his mental illness was so severe it was interfering with his ability to perform the basic tasks of presenting his defense. Defendant offers a number of other examples of behavior he contends demonstrate he was not competent to represent himself at trial. We have considered all these examples and find none of them persuasive.

29

Defendant claims, for example, his lack of mental competence was demonstrated by his "requested admission of a highly inflammatory videotape showing him acting angrily and violently in the holding room; even the prosecutor objected to admission of this tape." However, a closer examination of the record reveals that the prosecutor's objection was not based on potential prejudice to defendant but on undue consumption of time, and both the court and prosecutor recognized the video's relevancy to the defense theory that his admissions of guilt were the product of police misconduct. Thus, they ultimately worked out a compromise for presenting that evidence that was acceptable to all parties.[3] If anything, this episode demonstrates the opposite of what defendant is

---

[3] The trial court explained that compromise as follows:

"THE COURT: I think you have a right to play the entire … the north room video, because your defense appears to be in part that as a result of things that were said as a result of the conditions that you went through in this north video room that you ultimately broke down and told them what they wanted to hear, so I think what took place in the video room is relevant to your defense, and that's why I'm allowing you to play it.

"Now,—the stipulation would include all the start and stop times, and it would include the fact that there was no audio/video during the time periods that I have indicated. We would advise the jury that they have seen the portion of the time it is recorded in the north room which is an hour and 48 minutes long and they have seen approximately maybe 25 minutes or 30 minutes of it yesterday and between what was played previously.

"And, then, there's another hour and 20 minutes or so that's on this tape. There's a stipulation that what's on the tape accurately depicts what the conditions were during that period of time when you were in the north video room. And we're going to provide them a transcript for purposes of reviewing the tape if they wish to do so and further examine those conditions when they are deliberating, but I can't require them to look at the rest of it, it would be up to them to decide whether they want to look at that—rest of the hour and 48 minutes if we do it in that fashion, do you understand that? [¶] … [¶]

"THE DEFENDANT: I understand that completely.

"THE COURT: So with that in mind, did you wish to stipulate to the time periods as I indicated where there is no audio/video, advise the jury that the tape

30

arguing; it shows his mental illness was *not* interfering with his ability to carry out the basic tasks of presenting his defense. Rather, it appears he was able to engage in productive exchanges with the court and prosecutor, despite his often hostile and grandiose manner of addressing them.

We also disagree with defendant's claim that his mental incompetence at trial was evidenced by his "fail[ure] to accept there could ever be any basis in fact for the charges against him." It is not unusual for defendants, even ones represented by counsel, to continue to protest their innocence in the face of damning evidence or to claim a case against them is based on unreliable eyewitness testimony or a false confession produced by police misconduct. In other words, the record reflects that defendant was able to present a plausible, if ultimately unpersuasive, defense. We see no indication he lacked the mental competence to represent himself under the *Johnson* test.

We have reviewed and find inapposite the authorities on which defendant relies to support his claim on appeal. (See, e.g., *People v. Lightsey* (2012) 54 Cal.4th 668, 674 [trial court committed reversible error by permitting defendant to represent himself during competency proceedings], *United States v. Ferguson* (9th Cir. 2009) 560 F.3d 1060, 1069-1070 [remand to district court for limited purpose of considering whether its competency decisions would have been altered by intervening Supreme Court decision in *Edwards*], and *United States v. Duncan* (9th Cir. 2011) 643 F.3d 1242, 1250 [remand to

---

is admitted, the transcript is admitted, and they have the opportunity in their deliberations to view it … did you want to do that?

"THE DEFENDANT: Yes.

"THE COURT: All right.

"Ms. Danville [(the prosecutor)], is that agreeable to you?

"MS. DANVILLE: Absolutely."

31

district court for hearing to determine whether defendant competently waived right to appeal].)

## *DISPOSITION*

The judgment is affirmed.

_____
HILL, P. J.

WE CONCUR:


_____
DETJEN, J.


_____
LAPORTE, J.[*]

_____
[*]    Judge of the Superior Court of Kings County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.